[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 17, 2003
THOMAS K. KAHN
CLERK

No. 01-11821

D.C. Docket No. 00-00801-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LISA HUNTER, a.k.a. Lesa Hunter,

Defendant-Appellant.

_____

No. 01-11822

_____

D. C. Docket No. 00-00801-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KATINA SUMMERSET, a.k.a. Katina
Smith, a.k.a. Katina Sherita Summerset,

Defendant-Appellant.

_____

No. 01-11910
_____

D. C. Docket No. 00-00801-CR-KMM


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

REDDICK SEYMORE, a.k.a.
ERIC SEYMORE,

Defendant-Appellant.

_____

Appeals from the United States District Court for the
Southern District of Florida

_____

**(March 17, 2003)**

Before CARNES, MARCUS and SUHRHEINRICH[*], Circuit Judges.

SUHRHEINRICH, Circuit Judge:

Defendants Lisa Hunter ("Hunter"), Katina Summerset ("Summerset"), and

Reddick Seymore ("Seymore") (collectively "Appellants") appeal their sentences

---

[*]Honorable Richard F. Suhrheinrich, United States Circuit Judge for the Sixth Circuit, sitting by designation.

imposed following guilty pleas for conspiracy to make, utter, and possess counterfeit checks, in violation of 18 U.S.C. § 371. The principal issue on appeal is whether the district court erred in holding Appellants responsible for the entire amount of loss under U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(B) (1998).[1] We conclude that the district court misapplied U.S.S.G. § 1B1.3 by failing to make particularized findings as to the scope of criminal activity undertaken by each Appellant. We therefore vacate Appellants' sentences and remand for further proceedings in accordance with this opinion.

## I.

Appellants were participants in a counterfeit corporate check cashing ring that operated in South Florida from January 1997 until August 2000. The ring was led by Maceo Spates and Clarence Glover, who were the primary individuals responsible for printing the counterfeit checks and disbursing those checks to check cashers or "runners." Under Spates and Glover were Ormando White, Nathaniel White, and Frantz Coffey, who found runners for Spates and Glover and sometimes drove the runners to cash the checks. Finally, there were the runners, approximately nineteen in all. Appellants were runners.

Seymore's presentence report states that on February 7, 2000, Seymore cashed a counterfeit Consumer Credit corporate check at a NationsBank branch in

_____

[1]The 1998 version of the guidelines were utilized.

Broward County in the amount of $987.69. He had received the check from Ormando White. On May 1, 2000, Seymore cashed another counterfeit corporate check for $769.80. Seymore also admitted to agents that he cashed three other counterfeit checks he had obtained from White. Seymore indicated that he received one-third of the proceeds, one-third went to White, and the remaining third went to the printer of the checks. The probation officer calculated the total at $1,757.49.

Hunter's presentence report reflects that in 1997 Ormando White offered to help Hunter earn money. He took her to a bank and opened an account in her name, with money provided by White. Thirty days later, White deposited more money into the account. White also removed money from the account, and shared it with Hunter. On December 21, 1998, Hunter deposited a counterfeit corporate check in the amount of $2,500 into an account that she opened at a NationsBank branch in North Miami Beach. Hunter wrote a check on that account on the same date and received $400. She then wrote a check to Ormando White for $700, which White later cashed. On April 28, 2000, Hunter attempted to cash a counterfeit check at a NationsBank in the amount of $879.79, but exited the bank when the teller became suspicious. At her change of plea hearing, Hunter further admitted to having cashed checks for White since 1998. The probation officer calculated the amount cashed and intended to be cashed as totaling $3,379.79.

Summerset's presentence report reflects that she cashed a counterfeit corporate check on March 20, 2000, in the amount of $469.70, and another on April 18, 2000, in the amount of $1,849.79. On April 13, 2000, she attempted to cash a counterfeit corporate check in the amount of $2,469.79, but ran out of the bank when the teller became suspicious. On September 23, 1999, Summerset attempted to cash another counterfeit check in the amount of $848.79, but exited the bank when the teller became suspect. Summerset admitted to agents that since 1996 she cashed six to seven counterfeit checks totaling approximately $5,000. She identified Ormando White and an unindicted participant who worked as an assistant manager at a NationsBank. She also identified Karena Solomon and Miskea Smith Gray as runners. The probation officer calculated the amount cashed and intended to be cashed at $9,526.44.

The probation officer calculated the total actual loss of the entire conspiracy at $125,414.62. The probation officer determined that Appellants were each responsible for the loss related to the checks they personally cashed or attempted to cash, and not the total amount of loss of the conspiracy as a whole. The probation officer calculated each Appellants' base offense level at 6, pursuant to § 2F1.1(a) of the guidelines. See U.S.S.G. § 2F1.1(a) (1998). Hunter received an additional level for specific offense characteristics because she was found

responsible for losses equaling $3,379.79.  See U.S.S.G. § 2F1.1(b)(1)(B).

Summerset received an additional two levels under § 2F1.1(b)(1) because she was

found responsible for losses equaling $9,526.44.  See U.S.S.G. § 2F1.1(b)(C).

Seymore did not receive an additional level because the amount of checks he

cashed was $1,757.49.  See U.S.S.G. § 2F1.1(b)(1)(A).[2]

The Government filed objections, contending that each Defendant should be

held accountable for the total amount of loss.  Appellants countered they should

only be held responsible for the checks they cashed or attempted to cash.  The

probation officer took the position that the government had not provided sufficient

information to show that the defendants had the specific knowledge of the actions

of their co-defendants to rise to the level of reasonable foreseeability.

Summerset also objected to the presentence report's calculation of her

criminal history score. The presentence report assigned one point each for four

different state criminal convictions.  Summerset argued that her conviction in State

---

[2]All three defendants received an additional two levels due to the more than minimal planning involved in the scheme to defraud more than one victim under § U.S.S.G. § 2F1.1(b)(2).  Thus, Hunter's total adjusted offense level was 9, Summerset's total adjusted offense level was 10, and Seymore's total adjusted offense level was 8.  Each Defendant received a two-level reduction for acceptance of responsibility, giving Hunter a total offense level of 7, Summerset a total offense level of 8, and Seymore a total offense level of 6. With a total offense level of 8 and a criminal history category of VI, Summerset's guideline imprisonment range was 18 to 24 months.  Based on a total offense level of 7 and a criminal history category of III, Hunter's guideline imprisonment range was 4 to 10 months.  With a total offense level of 6 and a criminal history category of I, Seymore's guideline imprisonment range was 0 to 6 months.

Case No. 93-16177 for interference with custody related to her conviction in State Case No. 94-11316 for possession of marijuana because the two cases were consolidated for sentencing. Similarly, Summerset maintained that her conviction in State Case No. 97-5372 for grand theft was related to her conviction in State Case No. 99-11335 for petit theft because they had been sentenced together. Thus, Summerset argued that because she had been sentenced on two state cases at the same time, she should only receive a total of two points for the consolidated sentences instead of four points. In an addendum to her presentence report, the probation officer responded that the sentences were not related under U.S.S.G. § 4A1.2. because they were separated by an intervening arrest.

Hunter and Seymore also sought minor role reductions pursuant to U.S.S.G § 3B1.2.

**B.**

The district court conducted three sentencing hearings and determined that Appellants each should be held responsible for the $125,000 in actual losses. At Hunter's sentencing hearing, the court stated that "given the scope of the check cashing ring that it was reasonably foreseeable that she would be involved in a scheme resulting in the loss of the 125,000 plus dollars." At Summerset's hearing, the court incorporated its previous ruling regarding Hunter.

At Seymore's sentencing hearing, the district court found that:

This was a ring. In a ring it's not unusual that the various participants in the ring would not necessarily know one another unless they're at the leadership level. I don't know if that should result in any conclusion to suggest that they still were not a part of a ring even though they might not have known the other members of the ring.

It's certainly reasonably foreseeable they would be aware of the fact they were participating in a larger scheme than their own individual conduct. Subsequently they should be held accountable for the larger amount.

The district court gave each Defendant a 7-level increase to the base offense level for a loss of $125,414.62. See U.S.S.G. § 2F1.1(H) (1998).[3]

The district court refused to treat Summerset's prior sentences as related under U.S.S.G. § 4A1.2 because the offenses were separated by intervening arrests. The district court also denied Hunter's and Seymore's request for minor role reductions, finding that both Defendants were average participants in the conspiracy.[4]

---

[3]Thus, each Defendant received a total offense level of 13 (6 for the base offense level plus 7 for the specific offense characteristic). This increased Hunter's guideline imprisonment range to 18 to 24 months, Summerset's range to 33 to 41 months, and Seymore's range to 12 to 18 months.

[4]The district court sentenced Hunter to 24 months' imprisonment, a three-year term of supervised release, a $100 special assessment and restitution in the amount of $125,414.62. The court sentenced Summerset to 33 months' imprisonment, a three-year term of supervised release, a $100 special assessment and restitution in the amount of $124,465.12. Seymore was sentenced to 12 months' imprisonment, a three-year term of supervised release, a $100 special assessment and restitution in the amount of $128,870.86.

On appeal, each Appellant argues that the district court erred in attributing the entire amount of loss to him or her. Summerset also argues that her prior state convictions were related for purposes of § 4A1.2(a)(2). Hunter and Seymore contend that the district court erred in denying each a minor role reduction.

## II.

## A.

Section 2F1.1 of the Sentencing Guidelines, which applies to offenses involving fraud or deceit, requires the district court to increase the offense level if the dollar amount of the loss exceeds $2,000. U.S.S.G. § 2F1.1(b); see also United States v. Dabbs, 134 F.3d 1071, 1081 (11th Cir. 1998) (holding that § 2F1.1 requires the district court to increase a defendant's offense level based on the loss attributable to that defendant). Further, the Guidelines provide that an offense level shall be determined on the basis of the following:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added). Thus, the district court may hold participants in a conspiracy responsible for the losses resulting from the

reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy. Dabbs, 134 F.3d at 1082.  See also United States v. Rayborn, 957 F.2d 841, 844 (11th Cir. 1992) ("all losses caused by fraud or deceit which are governed by . . . § 2F1.1 may be imputed to a defendant who was a member of the conspiracy which caused those losses"); United States v. Fuentes, 991 F.2d 700, 701 & n.1 (11th Cir. 1993) (per curiam) (limiting Rayborn to reasonably foreseeable acts of co-conspirators).

The limits of sentencing accountability are not coextensive with the scope of criminal liability, however,  U.S.S.G. § 1B1.3, cmt. (n.1); see also United States v. Gallo, 195 F.3d 1278, 1280 (11th Cir. 1999) (noting that this provision "unambiguously limits enhancements" under § 1B1.3(a)(1)(b)).  Application Note Two sets out a two-pronged test.  It makes a defendant accountable for the conduct of others that was both: (1) in furtherance of the jointly undertaken criminal activity; and (2)  reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3, cmt. (n.2).  The Application Note further explains that

> In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).

Id.

That is, "to determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." United States v. Ismond, 993 F.2d 1498, 1499 (11th Cir. 1993) (citing U.S.S.G. § 1B1.3, cmt. (n.2)); United States v. Bush, 28 F.3d 1084, 1087 (11th Cir. 1994) (same); see also United States v. Campbell, 279 F.3d 392, 400 & n.5 (6th Cir. 2002) (same, and cases cited therein); United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995) ("This determination, as it goes to prong one of the test, must be made before the issue of foreseeability, prong two, is reached."). Only after the district court makes individualized findings concerning the scope of criminal activity the defendant undertook is the court to determine reasonable foreseeability. See Bush, 28 F.3d at 1087 (drug conspiracy); Studley, 47 F.3d at 574-75 (fraud case; citing Bush).

Application Note Two also provides guidance as to how the district court is to determine the scope of the defendant's agreement. It states that "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, cmt. (n.2).

Applying these principles to the case before us, it is clear that the district court erred in determining Appellants' relevant conduct. Although the district court made findings regarding reasonable foreseeability, it did not "first determine

the scope of the criminal activity [Hunter, Summerset, and Seymore] agreed to jointly undertake." U.S.S.G. § 1B1.3, cmt. (n.2). Rather, the court held simply that because each Defendant knew that he or she was part of a ring, he or she should be held accountable for all of the acts of all of the members. Yet the Guidelines establish that the fact that the defendant knows about the larger operation, and has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole. Campbell, 279 F.3d at 400, 401; Studley, 47 F.3d at 575. The district court erred in not making particularized findings as to the scope of each Appellants' agreement in the larger counterfeit check cashing operation.

The Government argues that each Defendant should be responsible for the entire loss because each pled guilty to Count 1, the conspiracy charge. As indicated above, this argument is at odds with the Sentencing Guidelines. Further, the Government maintains that Seymore is responsible for the total loss because he admitted to cashing several counterfeit checks and splitting the proceeds three ways between himself, recruiter White, and the printer of the checks. The Government also points out that Seymore admitted that he accompanied two of his codefendants when they cashed checks.

In the first place, the record reflects that Seymore did not join the conspiracy until 2000. He therefore cannot be held accountable for conduct that

occurred prior to his entry into the joint criminal undertaking. U.S.S.G. § 1B1.3, cmt. (n.2) ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct[.]"). As to the three-way split of the proceeds, this act shows agreement only to the jointly undertaken activity in the cashing of those two checks. Finally, as to accompanying codefendants Summerset and Canute McLeod, the district court may or may not find that Seymore's conduct was an implicit agreement in those jointly undertaken criminal acts.

The Government argues that Summerset should be on the hook for the full amount because she admitted cashing approximately nine checks over a four-year period for White, and because she identified others involved in the conspiracy. Although these facts would support a finding that she is accountable for those nine checks, they do not automatically support a finding that Summerset agreed to, or acquiesced in the entire scope of the conspiracy. Further, the mere fact that Summerset identified other runners working for White is not enough to make her accountable for their conduct, unless the Government can point to some other conduct from which an agreement can be inferred.

On the other hand, Summerset's presentence report states that she introduced her roommate, codefendant Karena Solomon, to White, and that Solomon likewise agreed to cash counterfeit checks for White. Also, on one

occasion Summerset accompanied White and Solomon to a NationsBank in Fort Lauderdale where Solomon cashed a counterfeit check for $5000.  White received $3000, Solomon received $1500 and Summerset received $500.  From Summerset's acceptance of the $500 it can be inferred that she agreed to jointly undertake in the cashing of that check.  Again, however, the district court must make particularized findings on remand.

The Government contends that Hunter is equally accountable because she admitted opening an account in 1998 for White and depositing counterfeit checks thereafter.  Again, this makes her responsible for the checks she cashed, but it does not necessarily suggest that Hunter knew the scale of the conspiracy of which she was a part, let alone that she agreed to the full extent of that criminal activity.  Further, there is nothing in the presentence report or record to show that Hunter agreed to be part of the larger conspiracy.  On remand the court will have to make particularized findings as to the extent of Hunter's agreement.

The Government points to illustration (c)(2) as supporting its position that Appellants are responsible for the entire amount of the loss.  That illustration provides as follows:

> Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone.  Defendant F fraudulently obtains $20,000.  Defendant G fraudulently obtains $35,000.  Each is convicted of mail fraud.  Defendants F and G each are accountable for the entire amount ($55,000).  Each defendant is accountable for the

> amount he personally obtained under section (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3, cmt. (n.2(c)(2)). However, we think it actually disproves their argument. As example 2 demonstrates, a relevant factor in determining whether an activity is jointly undertaken is whether the defendant assisted in designing and executing the scheme. Studley, 47 F.3d at 575, 576. Unlike the Guideline example, there is no proof in this record that any of the Appellants assisted Spates and Glover in designing and executing the larger illegal scheme. Except for Summerset's act of introducing Solomon to White, there appears to be no proof that Appellants assisted White either, other than in the cashing of certain checks.

Rather, we find this case much more akin to the scenario in another illustration. It provides:

> Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R.

U.S.S.G. § 1B1.3, cmt. (n.2(c)(7)). The record establishes that like Defendant S, Hunter, Summerset, and Seymore agreed to cash certain checks for White, and also knew that he was part of a larger check cashing ring. Further, like Defendant

S, it appears that Seymore's, Hunter's, and Summerset's involvement and agreement in the conspiracy may be limited to the checks each actually cashed. As this example shows, Appellants' mere awareness that White was involved in a much larger scheme is not enough to hold them accountable for the activities of the entire conspiracy. Studley, 47 F.3d at 575.

The Government's reliance on United States v. Hall, 996 F.2d 284 (11th Cir. 1993) (per curiam) is equally misplaced. In Hall, the defendant and other participants were involved in a fraudulent scheme in which they would contact potential victims, inform them that they had won a large cash prize, and then tell the victims that before the prize could be sent, they would have to wire money to pay the taxes on the prize. The district court included in its determination of Hall's relevant conduct amount of fraud losses that were caused by others. This Court affirmed. Significantly, we noted that although the various participants in the scheme acted on their own behalf, each of the participants knew each other and was aware of the other's activities, and they aided and abetted one another by sharing lead sheets of potential victims and sharing telephones. Id. at 285-86. In other words, from the act of sharing lead sheets and telephones, an agreement to join in the larger scheme could be inferred. In this case, by contrast, the Government has not presented any evidence of sharing or mutuality from which an agreement in the larger criminal scheme can be inferred. See Studley, 47 F.3d at

576 (vacating the defendant's sentence on the grounds that there was insufficient evidence to establish that the defendant had agreed to participate in the fraudulent activities of other sales representatives because the defendant neither designed nor developed the telemarketing scheme, did not promote the scheme beyond his own sales efforts, was paid on a commission basis and received no share of the profits, and did not assist any of the other sales representatives); cf. United States v. Giang, 143 F.3d 1078, 1080-81 (7th Cir. 1998) (holding that the defendant's "close collaboration with his cohorts established that the Hong Kong money scam was a joint undertaking"; although the defendant participated directly in defrauding one of three victims, he traveled with others from California to Wisconsin specifically to participate in the money scam, and he rented the car that facilitated the other fraudulent transactions); United States v. Martinez-Rios, 143 F.3d 662, 677-78 (2d Cir. 1998) (holding that the district court's findings as to the defendant's involvement in the victim's tax loss were sufficient under Studley because the court relied on extensive commingling of funds and the interdependent nature of the fraudulent accounts).

In sum, because the district court did not make particularized findings regarding the scope of Appellant's agreements, as required by § U.S.S.G. § 1B1.3(a)(1)(B), we vacate Defendants' sentences and remand for resentencing.

**B.**

Summerset argues that the district court erred when it calculated her criminal history score at 14 points instead of 10 points. She maintains that the court should not have counted her several state convictions separately under U.S.S.G. § 4A1.2. We review for clear error the finding that prior convictions are unrelated under § 4A1.2. United States v. Mullens, 65 F.3d 1560, 1565 (11th Cir. 1995).

In calculating a criminal history score, prior sentences imposed for related convictions should be counted as one sentence. U.S.S.G. § 4A1.2(a)(2). Application Note 3 provides in pertinent part as follows:

> Prior sentences "are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (A) occurred on the same occasion, (B) were part of a single common scheme or plan, or (C) were consolidated for trial or sentencing.

U.S.S.G. § 4A1.2, cmt. (n.3).

The language of Note 3 is clear. In determining whether cases are related, the first question is always whether the underlying offenses are separated by an intervening arrest. This inquiry is preliminary to any consideration of consolidated sentencing, as reflected by use of the word "otherwise." United States v. Gallegos-Gonzales, 3 F.3d 325, 327 (9th Cir. 1993); see also United States v. Aguilera, 48 F.3d 327, 330 (8th Cir. 1995) (same). This Court recently

adopted this interpretation of the guideline.  See United States v. Duty, 302 F.3d 1240, 1241-42 (11th Cir. 2002) (per curiam) ("While this court has no published decision applying this 'intervening arrest' rule, several of our sister circuits have applied the rule to hold that prior convictions are not related where the offenses underlying those convictions are separated by arrests. . . . We agree with these decisions.  Because Duty's state drug offenses were separated by intervening arrests, those offenses are not related, and the district court properly applied § 4B1.1.").

Summerset was sentenced on May 24, 1994, for both interference with custody and importation of marijuana.  She was arrested for the first offense on May 14, 1993, prior to committing the second criminal act on April 4, 1994.  The drug charge was an intervening arrest that precluded a finding that the cases were related, despite the common sentencing hearing.

Similarly, on June 3, 1999, Summerset was sentenced for both an April 3, 1999, fraud conviction and a 1997 grand theft conviction.  Her 1999 arrest for fraud occurred while she was on probation following her 1997 arrest for grand theft.  Thus, the 1999 arrest for fraud was an intervening arrest. In short, the

district court did not err in treating the four prior convictions separately and assigning criminal history points to each.[5]

## C.

Hunter and Seymore argue that the court erred in denying each a minor role reduction because they were only check cashers and less culpable than other participants in the scheme. We review a district court's determination of whether a defendant qualifies for a minor role adjustment for clear error. United States v. DeVaron, 175 F.3d 930, 937-38 (11th Cir. 1999) (en banc).

In DeVaron, the en banc court stated two legal factors to guide the district court in its fact-finding inquiry under U.S.S.G. § 3B1.2. "First and foremost, the district court must measure the defendant's role against her relevant conduct, that is, the conduct for which she has been held accountable under U.S.S.G. § 1B1.3." Id. at 934. Next, "where the record evidence is sufficient, the district court may also measure the defendant's conduct against that of other participants in the criminal scheme attributed to the defendant." Id; see also id. at 945 (same). Because a defendant's role in the offense should be informed by these two

---

[5]Summerset's reliance on United States v. Dorsey, 888 F.3d 79 (11th Cir. 1989) is misplaced. Dorsey is based on a prior version of U.S.S.G. § 4A1.2, cmt. (n.3), which, prior to 1991 arguably appeared to define all cases consolidated for sentencing as "related." Gallegos-Gonzales, 3 F.3d at 327-28 & n.2. However, Note 3 was amended in 1991 to make it clear that sentences separated by intervening arrests are never related. Id.

principles, and we are remanding for a redetermination of each Appellants' relevant conduct, it is premature for us to rule on this issue today. We direct the district court on remand to review our decision in <u>DeVaron</u>.

## III.

For all the foregoing reasons, we **VACATE** Appellants' sentences and **REMAND** to the district court for particularized findings regarding the scope of Defendants' agreement to participate in the fraudulent scheme and for resentencing in accordance with this opinion. Finally, the district court may also need to revise the amount of restitution imposed on each Appellant in light of its findings on remand.