[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13152
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-20156-KMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GESER DUGAROV,
a.k.a. Alan Goldberg,
a.k.a. Chingis Dashitsyrenov,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 21, 2015)

Before TJOFLAT, WILSON, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Defendant Geser Dugarov appeals his 60-month sentence, which the district court imposed after he pled guilty to conspiring to transport stolen vehicles and vessels in interstate and foreign commerce, in violation of 18 U.S.C. § 371.  On appeal, Defendant argues that the district court erred by imposing a four-level enhancement for his leadership role in the conspiracy.  He also argues that, in determining the loss amount, the district court erred by holding him accountable for the theft of an expensive boat:  the "Baby J."  After careful review, we affirm Defendant's sentence.

## I.  Background

### A.    Underlying Offense Conduct

A factual proffer, agreed to by both the Government and Defendant and provided to the district court when Defendant entered his plea of guilty, indicated that Defendant was part of a scheme to steal high-end automobiles and boats to sell to buyers located in Russia and Eastern Europe.  The organization paid straw purchasers to buy the automobiles, then replaced the vehicle identification numbers, created fictitious title papers, and resold the automobiles overseas. Thereafter, the straw purchasers reported the automobiles as stolen in order to be relieved from further payments to the lien holders.

Based on records obtained by the FBI from an export company/freight forwarding company, Defendant was responsible for sending at least eight vehicles

2

overseas.  Defendant provided the export company with fraudulent titles that made the vehicles appear to have clean titles.  Defendant also escorted two of the vehicles to the port for shipment overseas.  The FBI interviewed the "owners" of each of the vehicles shipped overseas, who admitted to acting as straw purchasers and to falsely reporting the vehicles as stolen.  A search of Defendant's apartment revealed keys for a stolen Mercedes Benz, $119,000 in cash in a plastic bag, a fraudulent title for the stolen Mercedes Benz, the license plate to an Audi that had been reported as stolen, shipping documents including fake titles, and laptops containing photos of a fraudulent title for the stolen Audi and a dock receipt.

Agents recorded a conversation between Defendant, Denis Polenov (an unindicted member of the conspiracy), and a confidential informant ("CI").  In that conversation, Polenov and Defendant discussed the possibility of the CI acting as a straw purchaser for a car that Polenov and Defendant wanted to obtain and sell overseas.  Polenov and Defendant wanted to use the car to check a shipping route and, if that route worked, the organization would then start sending more cars via the route.  Polenov stressed to the CI the importance of waiting three or four months after turning over the vehicle to Polenov or Dugarov to report the vehicle stolen.

In a recorded conversation between Defendant and a second CI, Defendant could be heard asking the CI if he was willing to steal two boats from a boat

dealership.  The CI declined the offer, but later learned from Defendant that the two boats had been stolen.  Then after the stolen boats were recovered, Defendant lamented to the CI that because the boats had not been successfully exported, Defendant would not be paid by the intended purchaser, meaning Defendant would be unable to pay the thieves.

Defendant was also involved in the December 2011 theft of an expensive boat named "Baby J."  After being reported stolen by its owner, the "Baby J" was found in Mexican territorial waters with two cohorts of Defendant on board:  Oleg Denisov and Vladimir Galkin.  Denisov and Galkin told Mexican law enforcement that they had paid Defendant to rent the "Baby J" and that Denisov had signed a rental contract with Defendant.  A signed copy of some contract between the men and a copy of Defendant's passport were found during a search of the boat. Denisov and Galkin made bond in Mexico, but fled the country.  A third CI recorded a conversation between Denisov, Galkin, and Defendant, in which (1) Defendant discussed Denisov and Galkin's arrest, (2) Defendant indicated he was upset with Denisov and Galkin for giving his name to the Mexican authorities, and (3) Defendant discussed the fact that he had already been paid for the "Baby J," but was unable to deliver it because it had been seized.

Defendant was indicted for one count of conspiring to transport stolen vehicles and vessels in interstate and foreign commerce, three counts of

4

transporting a stolen vessel in interstate and foreign commerce, one count of conspiring to transport stolen goods worth $5,000 or more in interstate and foreign commerce, and seven counts of transporting stolen goods worth $5,000 or more in interstate and foreign commerce.  Pursuant to a written plea agreement, Defendant pled guilty to the conspiracy count.

B.      Presentence Investigation Report ("PSR") and Sentencing Hearing

After Defendant entered his guilty plea, the probation office prepared Defendant's PSR and calculated a base offense level of six under U.S.S.G. § 2B1.1(a)(2).  Because the probation office determined that the amount of loss was more than $1,000,000 but not more than $2,500,000, Defendant received a 16-level enhancement under § 2B1.1(b)(i)(I).  The probation office also applied three separate two-level enhancements finding that (1) the offense involved receiving stolen property and the defendant was in the business of receiving and selling stolen property; (2) a significant portion of the offense was committed outside of the United States and/or involved sophisticated means; and (3) the offense involved an organized scheme to steal vehicles, pursuant to § 2B1.1(b)(4), (b)(10)(B) or (C), and (b)(14)(A), respectively.  Additionally, Defendant received a four-level enhancement as an organizer or leader of criminal activity that involved five or more participants, pursuant to § 3B1.1(a).  Lastly, the probation office applied a three-level acceptance-of-responsibility reduction, pursuant to § 3E1.1(a)

5

and (b), which yielded a total offense level of 29.  With a criminal history category of I, Defendant's guideline range was 87 to 108 months' imprisonment.  This guideline range exceeded the statutory maximum of 60 months applicable to the conspiracy count for which Defendant had pled guilty.

Prior to and at his sentencing hearing, Defendant objected to the 4-level leadership enhancement and the 16-level loss enhancement.  As to the leadership enhancement, Defendant argued that there was no evidence that he directed, managed, and compensated the straw purchasers as alleged in the PSR.  Instead, he asserted that he was merely part of a broader conspiracy and had been acting under the directions of others.  The district court overruled this objection, relying on the factual proffer that Defendant had agreed was correct, and the inferences that could be derived from that proffer.

As to the loss enhancement, Defendant argued that the value of the "Baby J" ($1,200,000) should not be included in his loss amount because he had not conspired to steal the "Baby J."[1]  In trying to explain why he was not complicit in that theft, notwithstanding evidence that indicated that he was, Defendant offered a very complicated explanation.  He did not deny that after identifying the boat, he

---

[1] Were the value of the "Baby J" subtracted from the loss calculation, the loss enhancement would have been decreased from 16 to 14 levels.  Defendant also disputed at sentencing the valuation of the other two boats that he had conspired to steal, but the district court overruled this objection.  By not raising an argument on appeal contesting the valuation of these other two boats, Defendant has abandoned this issue.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

had contacted Denisov and Galkin with an offer to show it to them so that they might later steal it. Nor did he deny that Denisov and Galkin did show up, look at the boat, indicate that they would steal it, and also pay Defendant what would appear to be a "finder's fee" of $7,500. Finally, he did not deny that Denisov and Galkin did, in fact, later steal the "Baby J."

What he argued to that district court was that, although all of the above happened, it had actually been his plan that Denisov and Galkin would show up with $140,000 to rent the boat from Defendant (before later coming back to steal it) at which time two other cohorts of Defendant's, Daniel and Orlov, would appear and rob Denisov of the $140,000 that he was bringing with him. Bottom line: Defendant claimed before the district court that it was never his intention for the "Baby J" to actually be stolen, but stolen it was.

The district court was unpersuaded by Defendant's argument that he should not be held accountable for the theft of the "Baby J," and it held him accountable for the loss amount attributable to the theft of that boat. The court found that, even on the facts admitted by Defendant, the theft of the "Baby J" was reasonably foreseeable and Defendant was an important force in making that happen. The district court's rulings resulted in a guideline range of 87-108 months' imprisonment. But, as the statutory maximum for the conspiracy count was five

7

years, the latter was the highest sentence the court could impose.  After considering

the § 3553(a) factors, the court sentenced Defendant to 60 months' imprisonment.

## II.  Discussion

### A.    Leadership Enhancement

Defendant argues on appeal that the district court erred in applying the four-

level leadership enhancement because there was no evidence that he led or directed

any other members of the conspiracy.  The Government contends that ample

evidence exists to support this enhancement.[2]  We review a court's enhancement of

a defendant's offense level based on the latter's role as an organizer or leader for

clear error.  *United States v. Rendon*, 354 F.3d 1320, 1331 (11th Cir. 2003).  There

is "no clear error in cases in which the record supports the district court's

findings."  *United States v. Petrie,* 302 F.3d 1280, 1290 (11th Cir. 2002).

---

[2]  In his appellate brief, Defendant states that Government counsel at sentencing agreed that his objection to the loss enhancement should be sustained.  That assertion is accurate only to a point.  Initially, the Assistant United States Attorney ("AUSA"), Ms. Botero, who was pinch-hitting for the AUSA who had previously handled the case, Mr. Dobbins, informed the court of her understanding that Dobbins had previously agreed that Defendant should not receive the loss enhancement.  The district court probed AUSA Botero as to why the Government would take this position, given that it appeared to the court that the enhancement should apply.  Botero responded that she could not explain why Dobbins took this position as Botero had likewise initially thought that the enhancement should apply and had originally submitted a response to that effect to the probation officer, before learning of Dobbins' reported position.  Further, the agent likewise thought the enhancement should apply.  But because Dobbins, who was on vacation in Siberia, was unreachable, Botero could not respond to the court's question.  Nevertheless, she wanted to honor any promise that another AUSA may have made.  Which she clearly did throughout the proceeding.

The district court did not feel obliged to accede to whatever position Dobbins may have said he would take.  And, in fact, Defendant has made no allegation of a breach of a plea agreement on this matter.  Indeed, the plea agreement contains no representation regarding the Government's position on a leadership enhancement.

The Sentencing Guidelines call for a four-level enhancement where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  Factors that courts should consider when determining whether to apply this enhancement include:  (1) the exercise of decisionmaking authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.  *Id.* § 3B1.1, comment. (n.4).  "There is no requirement that all of the considerations have to be present in any one case."  *United States v. Caraballo*, 595 F.3d 1214, 1231 (11th Cir. 2010) (citation omitted).

Evidence that the defendant recruited and instructed participants in the conspiracy is sufficient to support a leadership enhancement.  *United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006).  "Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership."  *Id.* (citation omitted).  A defendant's management of assets, standing alone, is insufficient to support an enhancement under § 3B1.1.  *United States v. Glover*, 179 F.3d 1300, 1302-03 (11th Cir. 1999).

9

Here, Defendant does not dispute that the "criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Rather, he disputes his role as a leader. Based on Defendant's factual proffer and the recorded undercover conversations with him, we disagree. Instead, we conclude that the district court reasonably concluded that Defendant recruited and instructed the straw buyers who purchased the automobiles that he caused to be shipped overseas and that were attributed to him at sentencing. Indeed, an undercover recorded conversation reflected that Defendant and Polenov attempted to recruit a CI to act as a straw purchaser of a specific vehicle that Defendant and Polenov then planned to take and sell overseas. During that conversation, they directed the CI as to what he would be expected to do. Another conversation reflected that Defendant attempted to recruit a different CI to steal two boats from a dealership in Miami. While supervision of a government informant would be insufficient, by itself, to permit a role enhancement,[3] one can reasonably infer that Defendant similarly interacted with the real straw buyers who purchased the vehicles at issue in this case. In fact, the factual proffer indicates that after Defendant's failed attempt to recruit the CI to steal the two boats, he recruited another individual who

---

[3] To receive an enhancement under § 3B1.1, a defendant must have acted as the supervisor, leader, or manager of another participant. *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009); U.S.S.G. § 3B1.1, comment. (n.2) A confidential informant, however, cannot count as a participant because he is not criminally responsible for the commission of the offense. U.S.S.G. § 3B1.1, comment. (n.1); *see United States v. Griffin*, 945 F.2d 378, 384 n.6 (11th Cir. 1991).

10

did in fact steal the boats and Defendant was responsible for paying this person. Moreover, Defendant has not indicated that anyone other than he and Polenov were involved in the recruitment and instruction of the straw purchasers.

In addition to Defendant's role in the recruitment, instruction, and payment of straw purchasers, the nature of Defendant's participation in the offense also supports the conclusion that Defendant was an organizer or leader in the conspiracy. *See* U.S.S.G. § 3B1.1, comment. (n.4). Simply put, the factual proffer reflects that Defendant was involved in almost every step of the scheme. The recorded conversation between Defendant, Polenov, and a CI reflected that Defendant was involved with Polenov in the discovery and development of the shipping routes used to send the vehicles overseas. Defendant was also involved in the actual shipment of the vehicles. He made the arrangements with the export company for the shipment of the automobiles overseas, provided the company with fraudulent titles, and escorted the automobiles to the port when they were shipped. Finally, it was Defendant who received payment for the stolen vehicles once they were received overseas. As the leader of the operation, Defendant coordinated with the straw buyers he had recruited and trained.

Given the extensive nature of Defendant's involvement in every aspect of the offense, including his recruitment of straw buyers and direction to them as to which automobiles to acquire and how to explain the later loss of those vehicles,

the district court did not clearly err in finding that Defendant was a leader.  *See Ndiaye*, 434 F.3d at 1304; U.S.S.G. § 3B1.1, comment. (n.4).  Further, that Defendant shared the role of leader in the conspiracy with Polenov does not shield him from the leadership enhancement.  *See United States v. Vallejo*, 297 F.3d 1154, 1169 (11th Cir. 2002) ("The defendant does not have to be the sole leader or kingpin of the conspiracy in order to be considered an organizer or leader within the meaning of the Guidelines.").  Accordingly, we discern no clear error in the district court's imposition of the four-level leadership enhancement.

B.    Amount of Loss

The district court calculated the amount of loss as $1,679,000, which included the value of the automobiles ($159,000), the value of the two less expensive boats ($320,000), and the value of the "Baby J" ($1,200,000).  Defendant argues that the district court erred in holding him responsible for the value of the "Baby J."  In essence, Defendant argues that his jointly undertaken criminal activity was not with Denisov and Galkin, whom he solicited to steal the boat, but instead was with Daniel and Orlov, who purportedly were planning to rob Denisov and Galkin before they could actually steal the boat.  We review the district court's determination regarding the amount of loss for clear error.  *United States v. Rodriguez*, 751 F.3d 1244, 1255 (11th Cir. 2014).

12

Section 2B1.1 of the Sentencing Guidelines instructs courts to increase a defendant's offense level based on the loss attributable to that defendant.  U.S.S.G. § 2B1.1(b).  Under U.S.S.G. § 1B1.3, the district court may hold conspiracy participants responsible for the losses that result from the reasonably foreseeable acts of co-conspirators done in furtherance of the conspiracy.  *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003).  A defendant is accountable for the conduct of others involved in the conspiracy if that conduct was both:  (1) in furtherance of the jointly undertaken criminal activity; and (2) reasonably foreseeable in connection with that criminal activity.  U.S.S.G. § 1B1.3(a)(1)(B).  A jointly undertaken criminal activity is a criminal plan or scheme undertaken by the defendant together with others, even if not charged as a conspiracy.  *Id.* § 1B1.3(a)(1)(B), comment. (n.2).  Whether the defendant assisted in designing and executing the scheme is a relevant factor in determining if an activity is jointly undertaken.  *Hunter*, 323 F.3d at 1321.

In determining a defendant's liability for the acts of others, the district court "must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant."  *Id.* at 1319 (quotation marks omitted).  "Only after the district court makes individualized findings concerning the scope of criminal activity the defendant undertook is the court to determine reasonable foreseeability."  *Id.*  That being said, "a sentencing court's failure to make

individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record support[s] the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendant." *Petrie*, 302 F.3d at 1290.

What is "[r]easonably foreseeable" is not limited to actions that were expressly agreed to by the co-conspirators. *United States v. Martinez*, 924 F.2d 209, 210 n.1 (11th Cir. 1991). Rather, "[an act is] reasonably foreseeable [if it is] a necessary or natural consequence of the unlawful agreement." *Id.* (quotation marks and citation omitted).

As noted in the background discussion above, and as agreed to by Defendant in his factual proffer, less than a month after the owner of the "Baby J" reported it stolen, Denisov and Galkin were discovered on the boat in Mexican waters. Investigation by Mexican authorities and the FBI tied Defendant to this theft. Specifically, when Denisov and Galkin were found on board the stolen boat, they told authorities that they had rented the boat from Defendant. During a search of the boat, Mexican authorities found some sort of contract between Defendant and Denisov, as we well as a copy of Defendant's passport. After receiving a bond, Denisov and Galkin fled Mexico, but later an FBI informant recorded a conversation between Defendant, Denisov, and Galkin during which the men discussed the arrest in Mexico. The men discussed the fact that Defendant had

14

already been paid for the "Baby J," but could not now deliver it because Mexican authorities had seized it. Further, Defendant was upset that Denisov and Galkin had given Mexican authorities his name.

The above evidence, particularly the taped conversation, would seem to provide an adequate basis for concluding that Defendant had engaged in jointly-undertaken activity with the above two individuals to steal the boat, and later sell it. If so, Defendant could properly be held responsible for the loss amount attributable to the theft of the boat. But, at sentencing, Defendant added a factual twist to the story. As for his role in this theft, Defendant admitted that he had seen the boat in a marina in Miami-Dade County and had summoned Denisov and Galkin to the site to suggest to them that they steal it. According to Defendant, Denisov and Galkin indicated that they would steal the boat; and, for reasons that Defendant does not well explain, Defendant says that they gave him $7,500. Thereafter, Denisov and Galkin presumably stole the "Baby J," because a month later, the boat was stolen and then later found in Mexican waters with them on board.

None of the above seems very helpful to Defendant in avoiding a connection with the theft, but he added one more wrinkle at the sentencing hearing to his version of events. At sentencing, in an explanation that is rather hard to follow, Defendant testified that he was lying to Denisov and Galkin when he told them that

15

he wanted them to come to the marina to check out the "Baby J" for purposes of later stealing it. Instead, Defendant said at sentencing, he anticipated that they would bring $140,000 with them to "rent" the boat from him, at which point, when they showed the money, they would then be robbed by two other cohorts of Defendant's: Daniel and Orlov. From all the above, Defendant argues that it was not reasonably foreseeable to him that Denisov and Galkin would not be robbed, when they arrived to inspect the boat, and therefore it was not reasonably foreseeable to him that they would later come back and steal the boat, which, of course, was the suggestion that Defendant had originally made to them at the outset. (It is also not clear why Denisov and Galkin could not have come back later and stolen the boat, even if they had earlier been robbed).

The district court did not sort through these factual variables and make a finding as to which one he found to be most credible, based on the undisputed evidence in the factual proffer, the testimony of Defendant, and the testimony of the FBI agent. Had the court made a finding, for example, that the taped discussion indicated that Defendant must have been involved in the theft of the boat—else why would he have already sold the boat to someone else—then this present discussion would be at an end, because such a finding would clearly support an inference that Defendant was involved in the taking of this boat.

16

Instead, of making a specific factual finding as to the accuracy of Defendant's rather hard-to-follow story about his interaction with Denisov, Galkin, and others, which the district court characterized as "self-serving" and "given to minimize his role," the court announced that it was satisfied that Defendant should be held responsible for the loss amount attributable to the "Baby J" theft "for a couple of reasons."  The first reason was that, even assuming the truth of Defendant's testimony—that he brought Denisov and Galkin to the marina under a pretext of offering up to them a boat to be stolen, while actually thinking that they would be robbed by Orlov and Daniel—Defendant's explanation could not negate the fact it was he who solicited Denisov and Galkin to steal the boat, meaning it was entirely foreseeable to him that they would do exactly that.  And in fact they did later steal the boat.  Further, when Denisov and Galkin showed up at the marina, but did not get robbed, instead telling Defendant that they would steal the boat and giving him $7,500 apparently as a finder's fee, their future theft of the boat was no longer just foreseeable to Defendant; it was now virtually inevitable. Indeed, when one arranges for Russian organized crime members to steal a boat, one had best anticipate that they are not kidding around.  *See Martinez*, 924 F.2d at 210 n.1.

The district court also offered a second reason why Defendant's objection to inclusion of this loss amount would not affect the sentence, when it indicated that it

17

would impose a 60-month sentence even if it sustained the Defendant's objection to a four-level enhancement.  Specifically, a four-level subtraction from the PSR's calculations would have resulted in an offense level of 25, with an advisory guidelines range of 57-71 months, and a statutory cap of 60 months.  In other words, at best, Defendant was looking at a 57-60 month range.  Just prior to imposing the sentence, the court indicated that even with a four-level reduction, Defendant would be looking at a 60-month sentence "under any circumstance." We have held that a Guidelines calculation error is harmless when (1) the record includes evidence that the district court would have reached the same result even if it had decided the Guidelines issue the other way, and (2) the sentence imposed would be reasonable even if the Guidelines issue had been decided that other way). *See United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006).

For all the above reasons, we find no reversible error in the district court's decision to include the loss attributable to the theft of the "Baby J" in its guideline calculations.

## III.  Conclusion

For all the reasons above, Defendant's sentence is **AFFIRMED.**

18