[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11077
Non-Argument Calendar
_____

D.C. Docket No. 4:18-cr-00024-WTM-CLR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

UCHECHI OHANAKA,

Defendant - Appellant.
_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(June 24, 2020)

Before MARTIN, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Uchechi Ohanaka, a federal prisoner, appeals his 125-month sentence for

conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349.  He

argues that the district court erred in calculating a total intended loss amount of

$1.716 million and refusing to reduce his offense level because his crime was merely an attempt. After careful review, we affirm.

## I.

On October 9, 2018, Ohanaka pled guilty to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349. The Probation Department prepared a presentence investigation report ("PSR"). The PSR described a conspiracy in which Ohanaka, Marvin Courson, and others impersonated wealthy bank customers to gain access to their credit lines. In November 2017, law enforcement arrested Courson at a Regions Bank branch in Dallas, Texas, where he was using information provided by Ohanaka to impersonate a bank customer named Irving Kahn to access Kahn's $700,000 credit line.

After his arrest, Courson began cooperating with law enforcement. He told law enforcement that Ohanaka gave him documents that Courson used to impersonate real people and try to withdraw money from their financial accounts. In December 2017, under the supervision of law enforcement, Courson worked with Ohanaka to try and access the bank accounts of Mark Emas. At this time, Ohanaka provided Courson with documents containing Emas's personal identifying information and signature. Ohanaka gave Courson a fake Florida driver's license with Courson's picture but Emas's personal information, as well as

2

a fake credit card embossed with Emas's name.  He instructed Courson to memorize Emas's personal identifying information and to practice replicating Emas's signature.  Ohanaka traveled to Texas and waited in a car outside a BBVA Compass bank branch in Irving, Texas, while Courson went into the bank and successfully withdrew $216,000 in the form of a cashier's check from Emas's home equity line of credit.  Courson left the bank and got into Ohanaka's parked car.  Federal agents then arrested Ohanaka.

After Ohanaka was arrested, law enforcement officers seized his cellphone and retrieved audio recordings sent through the messaging application WhatsApp.  In one of these messages, sent November 23, 2017, Ohanaka stated, "If you want to do two transactions that's fine.  I'm okay with that, but just give me one week because that's a lot of money . . . . You expect me to remove $800,000 within a few days now.  You know it takes time, but yes, it's doable."

The Probation Department calculated a base offense level of 7 under United States Sentencing Guidelines § 2B1.1(a)(2).  The PSR attributed to Ohanaka a total intended loss amount of $1.716 million: $700,000 based on the attempt to defraud Kahn, $216,000 based on the attempt to defraud Emas, and an additional $800,000 based on the recordings recovered from Ohanaka's cell phone.  Because the intended loss amount was between $1.5 million and $3.5 million, the PSR applied a 16-level increase under Guidelines § 2B1.1(b)(1)(I).  The PSR also applied two-

level increases each for the specific offense characteristics of relocating a fraudulent scheme to evade law enforcement, § 2B1.1(b)(10)(A), and possessing or using an authenticating feature, § 2B1.1(b)(11)(A)(ii).  It also added three levels, under Guidelines § 3B1.1(b), for Ohanaka's managerial or supervisory role in the conspiracy.  Finally, it applied a three-level total reduction for acceptance of responsibility under Guidelines § 3E1.1(a) and (b).  Based on an offense level of 27 and a criminal history category of IV, Ohanaka's recommended guideline range was 100- to 125-months incarceration.

Ohanaka objected to the PSR's intended loss calculations.  First, he objected to the $700,000 loss amount based on the attempt to defraud Kahn, on the ground that he did not have knowledge of the amount of credit that Kahn had available. He next objected to the $216,000 loss amount based on the information he provided Courson to withdraw funds using Emas's credit line.  He argued this loss amount was inappropriate because law enforcement prevented Courson from actually withdrawing funds.  He further argued this entitled him to a reduction under Guidelines § 2X1.1(b)(1), since it qualified only as an attempted crime. Finally, he argued that there was no evidence of overt action linking him to the $800,000 loss amount based on his WhatsApp voice messages.

Ohanaka raised substantially the same objections at his March 11, 2019 sentencing hearing.  Under oath, Ohanaka testified that the WhatsApp message

regarding the withdrawal of $800,000 was part of a conversation with Abu Azuka, a family friend who lives in Nigeria, regarding the purchase of vehicles and property. On cross examination, the government presented Ohanaka with messages sent to him by Azuka containing bank account information, usernames, passwords, addresses, and dollar amount limitations for a number of individuals. Ohanaka testified that he did not know whom the information belonged to and that he did not know why Azuka sent him the information.

Special Agent Jason Lynch of the United States Secret Service also testified at the sentencing hearing. He said his investigation revealed that Ohanaka and Courson typically gained access to bank accounts knowing the account balance. He said that Kahn's account had a credit limit of $700,000. However, on cross-examination he admitted he had no evidence of Ohanaka ever specifically stating that he knew the Kahn account had a $700,000 line of credit. Agent Lynch also testified that Ohanaka's conversations with Azuka were not consistent with international car sales. Rather, it appeared that Ohanaka and Azuka were discussing fraudulently withdrawing funds from the accounts of the people whose personal information Azuka sent to Ohanaka.

After hearing this testimony, the district court adopted the facts set out in the PSR as well as the advisory guideline calculations, including the total loss amount of $1,716,000. Based on these calculations, the court sentenced Ohanaka to a term

5

of 125-months imprisonment and five-years supervised release.  The court

explained that it imposed a sentence at the top of the guideline range because of

Ohanaka's history of fraud-related offenses, his failure to abide by court orders,

and his lack of candor with the court and the probation office.  Ohanaka timely

appealed.

## II.

We review <u>de novo</u> the district court's "legal interpretation of the sentencing

guidelines" and the "application of the sentencing guidelines to the facts."  <u>United

States v. Cubero</u>, 754 F.3d 888, 892 (11th Cir. 2014).  But we review for clear

error the district court's underlying factual findings, including the loss-amount

determination.  <u>Id.</u>; <u>United States v. Medina</u>, 485 F.3d 1291, 1297 (11th Cir. 2007).

The government bears the burden of proving the amount of loss by a

preponderance of the evidence.  <u>United States v. Cover</u>, 199 F.3d 1270, 1276 (11th

Cir. 2000) (per curiam).  This burden must be satisfied with "reliable and specific

evidence."  <u>United States v. Sepulveda</u>, 115 F.3d 882, 890 (11th Cir. 1997)

(quotation marks omitted).

## III.

On appeal, Ohanaka challenges his 16-level sentencing enhancement based

on the calculated intended loss of $1,716,000.  He first argues that he is entitled to

a three-level reduction under Guidelines § 2X1.1(b)(1), because the issuance of a

6

check to Courson under Emas's line of credit should have been categorized as an attempt to defraud Emas. He also argues that the $700,000 loss based on the attempt to defraud Kahn and the $800,000 loss based on his conversations with Azuka were too speculative to serve as the basis for his loss amount. We address these arguments in turn.

### A.

Ohanaka first argues that, if law enforcement agents had prevented Courson from completing the Emas transaction before he left the bank, the offense would have been only an attempt crime. He claims this entitles him to a reduction of his offense level under Guidelines § 2X1.1(b)(1). This argument is without merit.

Section 2X1.1(b)(1) entitles a defendant to a three-level reduction from the base offense level if the crime was an attempt. Section 2X1.1(b)(2) provides for the same reduction if the crime was a conspiracy. But Section 2X1.1(b)(2) does not apply if "the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." Section 2X1.1(b)(1) similarly allows the court to decline a three-level reduction for an attempt "if the factual circumstances show

7

that the offense was about to be complete but for an interruption beyond the defendant's control." United States v. Lee, 427 F.3d 881, 894 (11th Cir. 2005).

The district court did not err in finding Ohanaka ineligible for a three-point offense level reduction under § 2X1.1(b)(1) or (2). Ohanaka admitted at his change of plea hearing that he instructed Courson to enter the BBVA Compass bank branch and get a cashier's check for $216,000 in Emas's name. He also admitted that he provided Courson with the information necessary to impersonate Emas and complete this transaction. These admissions show, by a preponderance of the evidence, that at the time of his arrest Ohanaka had completed all the steps he thought necessary for his role in the bank fraud. This renders him ineligible for the reduction under either prong of § 2X1.1. Cf. United States v. Khawaja, 118 F.3d 1454, 1458 (11th Cir. 1997) (holding that the district court erred in failing to apply § 2X1.1(b)(2) where the conspirators had failed to take "crucial steps" in a money laundering scheme).

Neither does the fact that Courson was cooperating with law enforcement make Ohanaka eligible for a § 2X1.1 reduction. In this prosecution, as in most prosecutions for attempt or conspiracy, "the reduction is not warranted because the substantive offense had been substantially completed" and it was only because of law enforcement that the offense "was interrupted or thwarted." United States v.

8

Watkins, 477 F.3d 1277, 1280 (11th Cir. 2007).  The district court did not err by declining to give Ohanaka a three-level reduction under § 2X1.1.

B.

Ohanaka next argues that the district court erred in attributing a $700,000 loss amount based on the attempt to withdraw money from Kahn's account.  He claims there was no specific evidence in the record that Ohanaka knew the account had a $700,000 credit line.  While Ohanaka is correct that the government presented no direct evidence that he had knowledge of the value of Kahn's credit line, we conclude that circumstantial evidence sufficiently supported the district court's loss finding.

When calculating the amount of loss attributable to a defendant, the district court applies the greater of the actual or intended loss.  See USSG § 2B1.1(b)(1), cmt. n.3(A).  Intended loss is the pecuniary harm that the defendant purposely sought to inflict, including intended harm "that would have been impossible or unlikely to occur."  Id. § 2B1.1(b)(1), cmt. n.3(A)(ii).  While the government bears the burden of proving the amount of loss by a preponderance of the evidence, the sentencing court need only make a reasonable estimate of the loss amount.  Id. § 2B1.1(b)(1), cmt. n.3(C).  This is because "often the amount of loss caused by fraud is difficult to determine accurately."  United States v. Miller, 188 F.3d 1312, 1317 (11th Cir. 1999) (per curiam).

9

At the sentencing hearing, Agent Lynch testified that his investigation revealed that Ohanaka and his co-conspirators targeted credit lines specifically because of their high value and knew how much money was in the accounts they accessed. This contention was supported by a recorded conversation with Courson in which Ohanaka said that he knew that Kahn had a line of a credit and a checking account containing $4,000. It was also supported by Ohanaka's prior conduct. During the attempt to defraud Emas, Ohanaka informed Courson of the balances in Emas's account and instructed Courson to withdraw $216,000, which approached the total value of a credit line worth approximately $249,000.

Given this evidence, it was reasonable for the district court to infer that Ohanaka knew the credit limit on Kahn's account. See United States v. Manoocher Nosrati-Shamloo, 255 F.3d 1290, 1292 (11th Cir. 2001) (per curiam) ("A defendant's intent is often difficult to prove and often must be inferred from circumstantial evidence."). But even absent this inference, the district court did not clearly err in calculating a loss amount equal to the full value of Kahn's credit line. In an analogous case, this Court held that "once a defendant has gained access to a certain credit line by fraudulently applying for credit cards, a district court does not err in determining the amount of the intended loss as the total line of credit to which Defendant could have access." Id. at 1291. Similarly here, it was reasonable for the district court to infer that Ohanaka intended to withdraw all, or

10

close to all, of the funds available under Kahn's credit line, particularly in light of the fact that Ohanaka previously instructed Courson to withdraw nearly all of the funds available under Emas's credit line.

We therefore hold that the district court did not clearly err in applying a $700,000 intended loss amount based on Kahn's credit line.

### C.

Finally, Ohanaka argues that the district court erred in attributing to him an $800,000 intended loss based on his conversation with Azuka. He raises two objections on appeal. First, relying on his testimony at the sentencing hearing, he argues that his conversations with Azuka were about the purchase of cars and property. He claims the account numbers and personal identifying information Azuka sent him had nothing to do with illegal transactions and argues that the district court's conclusion that they did was mere speculation. Second, he argues that the district court erred by failing to define the scope of his criminal activity before determining the foreseeable loss amount. Neither of these arguments is persuasive.

First, although the government did not specifically identify targeted accounts, the loss amount was adequately supported by the record. The government uncovered Ohanaka's recorded statement that he was willing to remove $800,000 from an account in the near future. This message was sent in the

11

context of receiving from Azuka private personal and financial information similar to what Ohanaka had used to attempt to defraud Kahn and Emas.  Further, Agent Lynch testified that Ohanaka's conversation with Azuka was inconsistent with international automobile purchases and was more consistent with identifying new victims to target for fraud.  Taken together, this evidence was sufficient for the district court to find Ohanaka's explanation of the messages not credible and attribute to him the $800,000 intended loss amount.  See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (holding that deference is owed to the trial court's credibility determination, since it is in "a better position than a reviewing court to assess the credibility of witnesses").

Second, the district court did not commit reversible error by not making explicit findings regarding the scope of Ohanaka's criminal activity.  "[A] sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record support[s] the court's determination with respect to the offense conduct."  United States v. Petrie, 302 F.3d 1280, 1290 (11th Cir. 2002).  Ohanaka's claim that his voice message was not related to criminal conduct is not sufficient to upset the finding that the message showed his intent to work with coconspirators to defraud an unidentified person of $800,000.  And Ohanaka's reliance on United States v. Hunter, 323 F.3d 1314 (11th Cir. 2003), is of little help, as that case involved a

12

defendant's liability for actual losses caused by the actions of other coconspirators. See id. at 1319. We therefore conclude that the district court did not err in attributing the $800,000 loss amount to Ohanaka.

## IV.

Ohanaka has not shown either that the district court clearly erred in calculating the loss amount or that it erred in declining to award a reduction under Guidelines § 2X1.1(b)(1). We therefore affirm the sentence imposed by the district court.

**AFFIRMED.**