[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12445
Non-Argument Calendar
_____

D.C. Docket No. 4:13-cr-00020-WTM-GRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL JONATHAN BENNETT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(February 5, 2014)

Before HULL, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

After pleading guilty, Michael Bennett appeals his 48-month sentence for unlawful use of a facility in interstate commerce, namely his use of a cell phone as part of his involvement in a conspiracy to distribute schedule II and schedule IV controlled substances, in violation of 18 U.S.C. § 1952(a)(3).  On appeal, Bennett challenges only the district court's relevant conduct finding used to determine the amount of drugs attributable to Bennett at sentencing.  After review, we affirm.

## I.  BACKGROUND FACTS

### A.    Offense Conduct

In 2011, law enforcement conducted an undercover investigation of Donald and Martha Fowler, who were operating a large prescription drug distribution scheme in Chatham County, Georgia.  To conduct their operation, the Fowlers used between three and five "drug mules" to obtain prescription medications from various "pill-mill" doctors in Georgia and Florida.  During the investigation, agents searched the Fowlers' residence and seized approximately 2,500 prescription pills and drug ledgers dating back to 2003.

Defendant Bennett was one of the Fowlers' drug mules and traveled to various locations in Georgia and Florida to obtain pills.  Defendant Bennett was aware that he was not the Fowlers' only drug mule.  After his arrest, Bennett was interviewed by agents and admitted to his role in the Fowlers' pill distribution scheme.  Defendant Bennett said that the Fowlers kept drug ledgers with each drug

2

mule's transactions and acknowledged that his own participation in the scheme was recorded in the drug ledgers.

According to the drug ledgers and witness interviews, Defendant Bennett participated in the Fowlers' drug conspiracy from October 2007 to November 2011, for about 50 months. Defendant Bennett's name appeared on at least 52 separate pages of the drug ledgers, and each of those pages listed between 3 and 15 monetary transactions involving Defendant Bennett. A specific summary of Defendant Bennett's transactions does not exist. According to a prescription summary for Lori Jones, another of the Fowlers' drug mules, Jones obtained between 7.56 grams and 8.82 grams of oxycodone in each month between January and May 2011.

## B.    Presentence Investigation Report

The Presentence Investigation Report ("PSI") noted that there was no prescription summary of Defendant Bennett's transactions with the Fowlers. Using the prescription summary of Jones's transactions, the PSI estimated that each mule in the drug conspiracy was "attributed with obtaining a minimum of 7.56 grams of oxycodone each month," and that, therefore, Bennett was accountable for 378 grams of oxycodone (7.56 grams x 50 months). The PSI stated that the 378 grams of oxycodone was a conservative quantity representing

3

"the reasonably foreseeable relevant conduct in the jointly undertaken criminal activity."

Based on the drug quantity equivalency tables in U.S.S.G. § 2D1.1, the PSI converted the 378 grams of oxycodone to 2,532.6 kilograms of marijuana. See U.S.S.G. § 2D1.1, cmt. n.8(D) (providing that 1 gram of oxycodone is equivalent to 6,700 grams of marijuana). Using this drug quantity, the PSI calculated a base offense level of 30 under U.S.S.G. § 2D1.1(a)(5) and (c)(4). The PSI recommended that the offense level be decreased by three levels for acceptance of responsibility and by four levels because Bennett was minimal participant in the jointly undertaken criminal activity. With a total offense level of 23 and a criminal history category of IV, the PSI recommended an initial guidelines range of 70 to 87 months' imprisonment. However, because the statutory maximum sentence was five years, the advisory guidelines sentence became 60 months under U.S.S.G. § 5G1.1(a). In light of Bennett's substantial assistance to the government, the PSI recommended a 50-month sentence.

Bennett objected to the 378 grams of oxycodone attributed to him. Bennett argued that Jones's oxycodone transactions with the Fowlers were outside of the

scope of the criminal activity he agreed to undertake with the Fowlers and thus were not reasonably foreseeable to him.[1]

In an addendum to the PSI, the probation officer stated that 378 grams of oxycodone was properly attributed to Bennett as relevant conduct under U.S.S.G. § 1B1.3(a).  The probation officer had interviewed Martha Fowler and reviewed the drug ledgers with her.  According to Martha Fowler, Bennett visited the Fowlers' residence daily either to sell or buy pills or to "hang out," and Bennett knew he was not the only drug mule "because he was often present during drug transactions involving" Donald Fowler and the other mules.

During his post-arrest interview, Bennett also admitted, among other things, that he knew he had made the Fowlers a lot of money and that other individuals also had obtained pills and sold them to the Fowlers.  In fact, although Bennett conspired with the Fowlers and several other drug mules in furtherance of jointly undertaken criminal activity, Bennett was "only attributed with the drug amounts of one 'mule.'"

## B.    Sentencing

At sentencing, the parties agreed that there was no dispute as to the PSI's facts and that the dispute as to relevant conduct was a legal question.  The district

---

[1]Bennett also objected to the denial of safety-valve relief.  The district court overruled Bennett's safety-valve objection because Bennett's criminal history disqualified him for such relief.  Bennett does not challenge this safety-valve ruling on appeal.

court summarized the facts as follows: (1) Bennett worked as a drug mule for the Fowlers obtaining pills from doctors, keeping some, and selling the rest to the Fowlers; (2) on some occasions, the Fowlers accompanied Bennett on his doctor visits; (3) Bennett knew that other drug couriers were also supplying pills and that the Fowlers were selling the pills; and (4) Bennett knew the Fowlers well, visited with them often, and was aware that he made a lot of money for them. Bennett's counsel stated that he had no problem with the district court's understanding of the facts.

The district court then heard testimony from the probation officer and Bennett. According to this testimony, Bennett obtained for the Fowlers Xanax, hydrocodone, and Soma, schedule III and IV drugs. Defendant Bennett also sometimes bought prescription pills from the Fowlers, including oxycodone, a schedule II drug. Lori Jones obtained oxycodone pills for the Fowlers.

Defendant Bennett began supplying the Fowlers with his prescription drugs because he needed help getting to the doctor. The Fowlers loaned Defendant Bennett money to finance his trips to buy medications. Defendant Bennett would keep some pills, and sell the rest to the Fowlers to reduce his debt to them. The Fowlers also sometimes accompanied Defendant Bennett to his doctor visits.

Defendant Bennett was close to the Fowlers and was a friend of the Fowlers' son, who employed Bennett to do lawn care and automotive work. Defendant

6

Bennett visited the Fowlers' home frequently, at least two or three times a week. The Fowlers sold pills in their kitchen, and Defendant Bennett sometimes observed these transactions, but was not directly involved in them.

Defendant Bennett admitted that he knew that the Fowlers made money selling prescription pills, that they used other drug mules to obtain pills, and that they kept ledgers of their transactions. Defendant Bennett often saw Lori Jones at the Fowlers' home and assumed that she also supplied pills to the Fowlers. However, Defendant Bennett and Jones did not travel together to obtain pills, did not visit the same doctors, did not exchange pills or pool resources with each other, did not discuss obtaining or selling pills, and were not present for each other's transactions with the Fowlers. Defendant Bennett knew that, in addition to Jones, another source of supply for the Fowlers was Thomas Taylor.

At the conclusion of the evidence, the district court found that there was no objection to the factual statements in the PSI and adopted the PSI's findings of fact. As to drug quantity, the district court stated that it "agree[d] with the findings in the [PSI] and concur[red] with those findings, including the addendum." The district court stated that it had "made an individualized finding as regards to Mr. Bennett." The district court further stated that (1) the Fowlers' criminal activity was widespread, with drug mules going outside of Chatham County; (2) the Fowlers used several drug mules, some of whom Bennett knew and some of whom

7

he did not; (3) Bennett's involvement with the Fowlers lasted for many months; (4) Bennett both furnished to, and received drugs from, the Fowlers; and (5) Bennett knew of the Fowlers' widespread activities getting pills from others and distributing them because Bennett was in the Fowlers home on an almost daily basis and "could witness firsthand the comings and goings at the Fowler residence."

The district court concluded that "the estimate of drugs attributable to Mr. Bennett in this case is a conservative estimate" and agreed with the PSI that "this was in fact a jointly undertaken criminal activity by the Fowlers and Mr. Bennett and other individuals such as himself and that Mr. Bennett should have easily reasonably foreseen the acts and the omissions of others." The district court stressed that Bennett admitted he had assumed that Lori Jones "was doing the same thing he was doing and that what he and the others were doing was in furtherance of the jointly undertaken criminal activity in this case."

The district court adopted the PSI's calculations and advisory guideline sentence of 60 months. The district court granted the government's motion for a downward departure based on substantial assistance and, after considering the 18 U.S.C. § 3553(a) factors, imposed a 48-month sentence. Bennett renewed his objections to the district courts drug quantity finding and relevant conduct determination.

## II. DISCUSSION

The district court must approximate the drug quantity when, as here, a defendant's base offense level under the guidelines is determined by drug quantity, and the amount of drugs seized does not reflect the scale of the offense.[2] United States v. Frazier, 89 F.3d 1501, 1506 (11th Cir. 1996); see also U.S.S.G. § 2D1.1, cmt. n.5.  In estimating the drug quantity attributable to the defendant, the district court may rely on evidence demonstrating the average frequency and amount of the defendant's drug sales over a given period of time.  Id.  This determination may be based on fair, accurate, and conservative estimates of drug quantities attributable to the defendant, but not on mere speculation.  United States v. Zapata, 139 F.3d 1355, 1359 (11th Cir. 1998).  It is the government's burden to prove drug quantity by a preponderance of the evidence.  United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995).  However, the district court may rely on undisputed statements in the PSI.  United States v. Hedges, 175 F.3d 1312, 1315 (11th Cir. 1999).

Here, the district court had to estimate the amount of drugs involved in the underlying drug conspiracy while Bennett participated in it.  The district court did

---

[2]Section 2E1.2, the provision applicable to Bennett's offense, provides that the base offense level is either 6 or the offense level applicable to the underlying unlawful activity, whichever is greater.  U.S.S.G. § 2E1.2(a)(1),(2).  In Bennett's case, the offense level for the underlying drug conspiracy is determined using the drug quantity tables in U.S.S.G. § 2D1.1(c). Thus, the district court had to estimate the amount of drugs involved in the conspiracy to determine Bennett's offense level.

this by calculating the average amount of drugs that one of the Fowlers' drug mules, Lori Jones, obtained for the Fowlers per month (between 7.56 grams and 8.82 grams) and then attributing the low end of that amount (7.56 grams) to each of the three to five drug mules (including Bennett) who the Fowlers used in the drug conspiracy.  The district court then multiplied that average monthly drug quantity for one drug mule by the number of months Bennett participated in the conspiracy (50 months), to arrive at a conservative estimate of the total amount of drugs (378 grams) attributable to Bennett (representing 7.56 grams x 50 months = 378 grams).

On appeal, Bennett does not challenge the district court's factual findings as to the amount of drugs involved in the Fowlers' overall drug scheme or argue that the district court's method for estimating that drug amount was not conservative or was mere speculation.  Instead, Bennett argues only that the district court could not use Jones's oxycodone transactions with the Fowlers to calculate his drug quantity because Jones's oxycodone transactions were not part of the criminal activity he jointly undertook with the Fowlers and thus were not relevant conduct.[3]

Under the advisory guidelines, a defendant is held accountable for his "relevant conduct," which includes his own "acts or omissions" and also "all reasonably foreseeable acts and omissions of others in furtherance of the jointly

---

[3]Although we review a district court's finding of the drug quantity attributable to the defendant for clear error, United States v. Chavez, 584 F.3d 1354, 1367 (11th Cir. 2009), we review de novo whether the district court misapplied the relevant conduct provisions of U.S.S.G. § 1B1.3, United States v. McCrimmon, 362 F.3d 725, 728 (11th Cir. 2004).

undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(A), (B). In drug conspiracy cases, relevant conduct includes drug amounts with which the defendant was directly involved and also "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that the he jointly undertook." U.S.S.G. § 1B1.3, cmt. n.2.; United States v. Ismond, 993 F.2d 1498, 1499 (11th Cir. 1993).

A "jointly undertaken criminal activity" is a criminal plan or scheme undertaken by the defendant together with others, even if not charged as a conspiracy. U.S.S.G. § 1B1.3, cmt. n.2. The scope of the jointly undertaken activity is not necessarily the same as the scope of the entire conspiracy. Id. Thus, to hold the defendant responsible for the conduct of others, the district court must determine: (1) the scope of the criminal activity that the defendant agreed to jointly undertake; and then (2) whether the conduct of others was in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant. Id.; see also United States v. Hunter, 323 F.3d 1314, 1319-20 (11th Cir. 2003). In determining the scope of the criminal activity, the district court may consider any implicit agreement fairly inferred from the conduct of the defendant and others. U.S.S.G. § 1B1.3, cmt. n.2.

The district court also must make individualized findings as to the scope of the criminal activity undertaken by the defendant. Hunter, 323 F.3d at 1319;

11

Ismond, 993 F.2d 1499.  We need not reverse if the district court failed to make such findings, however, where the record as a whole supports the amount of drugs attributed to the defendant.  Ismond, 993 F.2d at 1499.

Here, Bennett had an individual sentencing hearing separate from the other participants in the Fowlers' drug ring.  The district court explicitly made individualized findings about Bennett's involvement in the Fowlers' drug scheme on the record at the sentencing hearing.  Specifically, the district court found that Bennett agreed to a "widespread" criminal undertaking with the Fowlers and other drug couriers—to obtain prescription medications from "pill mill" doctors throughout Florida and Georgia to distribute in Chatham County, Georgia—and that Bennett was aware of Jones's involvement in the undertaking as one of the drug couriers.  The district court also noted the length of Bennett's involvement with the scheme, his near-daily visits to the Fowlers' home, and his presence during some of the transactions.  Thus, the district court did not fail to make particularized findings as to the scope of Bennett's involvement in the drug conspiracy.

Bennett claims that Jones's oxycodone transactions are not relevant conduct because they were not in furtherance of the criminal activity he personally agreed to jointly undertake with the Fowlers.  Bennett argues that his criminal activity was limited to selling his own schedule III and IV prescription drugs to the Fowlers and

that he never agreed to jointly undertake the Fowler's larger scheme or Jones's criminal activity of selling the Fowlers the schedule II drug oxycodone.[4]

We find no merit to Bennett's contention that the district court was required to find that the Fowlers were engaged in separate criminal undertakings with Bennett and Jones.  Rather, the undisputed facts in the PSI and presented at the sentencing hearing amply support the district court's finding that Bennett, Jones, and the other drug mules were all participating in one scheme with the Fowlers to distribute prescription medications obtained from "pill mill" doctors in Georgia and Florida.

The record shows that Bennett knew he was involved in a widespread criminal undertaking that included Jones's conduct because: (1) Bennett visited the Fowlers' home almost daily, (2) he was present when the Fowlers conducted drug transactions in their home; (3) he supplied Xanax, Soma, and hydrocodone to the Fowlers repeatedly over 50 months knowing they were reselling those drugs; (4) he relied on the Fowlers to fund his travel to doctors to obtain those drugs; (5) he knew the Fowlers used other drug mules, including Jones, and resold the drugs the mules supplied; and (6) he sometimes purchased drugs from the Fowlers, including oxycodone, one of the drugs that Jones, but not Bennett, supplied to the Fowlers.

---

[4]On appeal, Bennett does not argue that Jones's drug transactions were not reasonably foreseeable to him or were not in furtherance of the Fowlers' overall drug operation.

Bennett correctly points out that mere awareness of the larger criminal undertaking is insufficient to show that a defendant agreed to participate in that larger criminal undertaking. See Hunter, 323 F.3d at 1320-21. However, the extent of a defendant's knowledge of and participation in the undertaking may be indicative of an agreement to participate in the larger scheme. See McCrimmon, 362 F.2d at 732-33. The facts here show that Bennett was more than merely aware of the Fowlers' overall drug operation; he was an active and trusted participant in the Fowlers' operation as both a courier and a purchaser for an extended period of time. Bennett was such a close associate of the Fowlers that they conducted transactions with others in his presence. In addition, Bennett relied upon the Fowlers to finance his doctor visits, which suggests Bennett was invested in and dependent on the success of the Fowlers' larger criminal undertaking. Likewise, Bennett's long-time and reliable supply of Xanax, Soma, and hydrocodone helped the Fowlers' scheme to succeed. And, Bennett furthered the scheme from the "demand" side by buying oxycodone from the Fowlers, which provided them an incentive to purchase more oxycodone from their oxycodone suppliers, including Jones.

In light of Bennett's long-term, extensive knowledge of and participation in the Fowlers' scheme, the district court properly inferred from Bennett's conduct that he agreed to jointly undertake the entire criminal scheme involving all the drug

14

mules.  Given that the scope of the criminal activity Bennett agreed to jointly undertake, the district court did not err in including Jones's oxycodone transactions as relevant conduct and using them to estimate the amount of drugs involved in that criminal activity.  Accordingly, we find no reversible error in the district court's application of U.S.S.G. § 1B1.3.

**AFFIRMED.**