[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10349
Non-Argument Calendar

_____

D.C. Docket No. 2:18-cr-00190-SPC-MRM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELIZABETH KUC,
a.k.a. Auntie,
a.k.a. Beth,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 25, 2021)

Before JILL PRYOR, BRANCH and LUCK, Circuit Judges.

PER CURIAM:

After a jury convicted defendant Elizabeth Kuc of conspiring to distribute and possess with intent to distribute crack cocaine, heroin, and fentanyl and distributing fentanyl and crack cocaine, the district court sentenced her to 360 months' imprisonment.  At the sentencing hearing, the district court found that Kuc was responsible for 17.44 kilograms of crack cocaine, 10.9 kilograms of heroin, and 0.5 grams of fentanyl, and used these drug quantities to set Kuc's offense level for purposes of the Sentencing Guidelines.  On appeal, Kuc challenges the district court's drug-quantity finding.  Because we cannot say that the district court clearly erred in making the drug-quantity determination, we affirm.

## I.    FACTUAL BACKGROUND

Kuc was charged in an indictment with conspiring to distribute and possess with intent to distribute 28 grams or more of crack cocaine, 100 grams or more of heroin, and 40 grams or more of fentanyl.  The government alleged that Kuc conspired with nine named co-defendants as well as other unnamed persons.  The government also charged Kuc with two substantive counts of distributing controlled substances:  fentanyl and crack cocaine.  Kuc pled not guilty and proceeded to trial.

## A.    Trial Proceedings

At trial, the government introduced evidence showing that Kuc participated in a drug organization headed by Tony Wilson, Jr., which operated in the Suncoast

2

Estates area of North Fort Myers, Florida.  The organization sold crack cocaine, heroin, and fentanyl out of trap houses, residences used for drug distribution.  The organization had multiple dealers working out of the trap houses in the Suncoast Estates area.  Wilson would have runners take the controlled substances to the dealers working in the trap houses and bring him the cash from the sale of the substances out of the trap houses.

The organization's main hub for distribution was a trap house called the "Big House," which was owned by Monique Moore, another member of the conspiracy.  When law enforcement officers surveilled the Big House, they saw people coming in and out of the house all day and night and staying only for a short time.  On one occasion, officers raided the Big House and seized a significant amount of crack cocaine—more than 30 "cookies" of crack cocaine[1] with a total street value of between $40,000 and $50,000.  On that day, officers also seized a mixture of heroin and fentanyl weighing 23.8 grams.[2]  Just one day after this raid, the organization resumed drug-dealing operations at the Big House.

At trial, the government introduced evidence that Kuc participated in the organization's drug distribution scheme in several ways.  She sold drugs herself

---

[1] A cookie of crack cocaine generally weighs between eight and nine grams.  The evidence at trial showed that a cookie of crack cocaine would be broken into smaller pieces of crack cocaine that drug dealers typically sold for approximately $20 each.

[2] The evidence at trial showed that drug dealers typically sold heroin and fentanyl in packages weighing 0.1 grams for about $20 per bag.

and helped others to buy drugs from Wilson, allowed Wilson to use her house to "cook" crack cocaine cookies, and reported to Wilson about the goings on at the Big House.

First, the government introduced evidence showing that Kuc participated in the organization by selling drugs and helping others in the other organization sell drugs. A witness testified that Kuc regularly sold crack cocaine and heroin, supplied by Wilson, from her bedroom. The government also introduced into evidence a recorded phone call in which Kuc discussed selling drugs for Wilson. In the call, Kuc mentioned that Wilson had recently gone on vacation and left her $9,000 worth of heroin to sell while he was out of town, saying that Wilson "brought everything here for everybody to come get it." Doc. 423-21 at 1.[3] Kuc sold all $9,000-worth of heroin and gave the proceeds to Wilson when he returned.

The government also introduced evidence of three instances where Kuc either sold drugs with her niece or assisted her niece in purchasing drugs from Wilson. At the time, Kuc's niece was, unbeknownst to Kuc, working as a confidential informant for the government and recording each transaction.

In the first transaction, Kuc sold an undercover officer $100 worth of fentanyl. Kuc's niece arranged for Kuc to sell the undercover officer heroin. Before selling the drugs, Kuc asked the undercover officer to snort some of the

_____

[3] "Doc." numbers refer to the district court's docket entries.

substance in front of her—a measure that, according to the evidence at trial, drug dealers sometimes use to ensure that a potential customer is not a law-enforcement officer or a confidential informant.  When the officer demurred, Kuc directed her niece to sell the drugs, apparently in an attempt to avoid criminal liability.  Kuc handed six small bags to her niece who, in turn, handed them to the undercover officer.  The undercover officer handed his money to the niece, who then handed it over to Kuc.  Although the undercover officer thought he was purchasing $100 of heroin, the substance was, in reality, fentanyl.[4]

In the second transaction, Kuc arranged for her niece to purchase an eight-ball (approximately four to five grams) of heroin from Wilson.  Kuc's niece approached Kuc about buying heroin from Wilson, and Kuc agreed to arrange the transaction in exchange for $100.  After arranging the purchase, Kuc went with her niece to meet Wilson.  Wilson sold Kuc's niece 3.5238 grams of a fentanyl mixture.

In the third transaction, Kuc's niece wanted to buy a cookie of crack cocaine and an eight ball of heroin from Wilson.  Kuc agreed to help her niece set up the transaction in exchange for $100.  Wilson directed Kuc to go to a trap house to pick up the drugs.  When Kuc and her niece arrived at the trap house, Kuc made

---

[4] Fentanyl is a synthetic opioid that is stronger than heroin.  The evidence at trial reflected that it is common for a person to buy what she thought was heroin and end up with fentanyl (or vice versa).

her niece wait outside, saying that Wilson told Kuc to go in by herself and "[I]

listen to what I'm told." Doc. 423-15 at 2. Kuc then purchased 8.48 grams of

crack cocaine from a dealer who worked for Wilson. But the dealer did not have

the heroin and directed Kuc to go to the Big House to pick it up. When Kuc and

her niece arrived at the Big House, Kuc could not purchase heroin there, either.

Kuc was angry that Wilson had not come through with any heroin. She

ranted to her niece:

> This is fucking bullshit. You want to see the text message that I wrote
> [Wilson]? It ain't fucking pretty. I'm gonna text him again. "You
> know what, [Wilson]? I don't get out of bed for fucking free. This is
> fucking bullshit that you had me go get these people money, have
> everything set up for today on my part. I go over to your place with
> over a thousand fucking dollars and I can't buy what I need to buy? It's
> fucking bullshit."

Doc. 423-17 at 2. She continued on saying, "[I] don't get up and move around for

fucking two bags, three bags, 45 fucking dollars. I don't even get out of my bed. I

could have stayed in my bed and made more than that." *Id.*

The second way that Kuc assisted the organization was by allowing Wilson

and his brother to use her home to cook significant amounts of crack cocaine. A

witness testified that "[e]very couple days" Wilson and his brother came to Kuc's

house to cook between four and eight crack cocaine cookies. Doc. 658 at 127.

And there was also evidence that Kuc helped Wilson by cooking crack cocaine

herself. In a recorded call, Kuc discussed picking up a "quarter piece" from

Wilson so that she could "finish making the candy," which was a reference to cooking crack cocaine.[5]  Doc. 423-21 at 4.

The third way that Kuc participated in the drug organization was by keeping Wilson informed about what was happening at the Big House.  For a time, Kuc lived next door to the Big House, and she reported to Wilson about the goings-on there.  During this time, law enforcement officers conducted a search at the Big House.  At the time of search, Moore, who owned the Big House, was in jail.  Shortly after the search, Moore called Wilson from the jail, and they added Kuc to their call.  Kuc told them that police officers had raided the Big House and discussed which neighbors might have reported them to police.  During the call, Wilson told Kuc that she was his "eyes and ears," meaning he depended on her, among others, to watch and report to him about what was happening at the Big House.  Doc. 423-27 at 8.

The government also introduced evidence at trial about the volume of drugs that the conspiracy was selling each day.  A member of the conspiracy estimated that each day the organization sold four cookies of crack cocaine, weighing a total of approximately 32 grams, and 100 to 150 bags of heroin, weighing a total of 10 to 15 grams.

---

[5] According to trial evidence, the term "candy" was commonly used in Suncoast Estates to refer to crack cocaine.

Kuc testified in her own defense.  She described herself as a "junkie" who needed to use heroin and crack cocaine each day to avoid becoming "violently ill." Doc. 658 at 181–82.  She denied agreeing to work with Wilson or anyone else to distribute drugs, saying she only bought drugs for her personal use.  When asked about the three drug transactions where she helped her niece buy or sell drugs, she said that her niece "coerced" her into participating.  *Id.* at 215.  She also denied that she sold $9,000 worth of heroin for Wilson when he was out of town.  She maintained instead that while Wilson was out of town, he left $9,000 worth of heroin in a safe in her room, but that she was visiting family at the time, did not know about the heroin until Wilson's brother retrieved it, and never sold any of it.

Kuc also denied that she allowed Wilson and his brother to cook crack cocaine at her house.  She admitted that Wilson and his brother cooked crack cocaine there but said she was forced to allow them to use her house when they threatened to harm her and her family physically.  And when she was asked about the phone call in which she discussed cooking "candy," she said she was talking about making rock candy or peppermints for children in her family, not discussing cooking crack cocaine.

The jury found Kuc guilty on all three counts.

## B.    Sentencing Proceedings

After the trial, a probation officer prepared a presentence investigation report ("PSI").  The PSI detailed the operations of the drug conspiracy and reported that Kuc participated in the conspiracy from at least April 7, 2016 through October 4, 2017.[6]  According to the PSI, during this period, each day the conspiracy distributed at least four eight-gram cookies of crack cocaine and 200 0.1-gram bags of heroin and/or fentanyl.  Because Kuc participated in the conspiracy for at least 545 days, the PSI held her accountable for 17.44 kilograms of crack cocaine, 10.9 kilograms of heroin, and 0.5 grams of fentanyl.

Given these drug quantities, the PSI reported that Kuc had a base offense level of 36.  *See* U.S.S.G. § 2D1.1(c)(2).  The PSI then applied a two-level enhancement because Kuc had maintained a premises for the purpose of manufacturing or distributing a controlled substance and another two-level enhancement because she had obstructed justice by giving false testimony at trial.  *See id.* §§ 2D1.1(b)(12), 3C1.1.  With a total offense level of 40 and a criminal history category of V, the PSI calculated Kuc's guidelines range as 360 months' to life imprisonment.  Because the statutory maximum for Kuc's offenses was 80

---

[6] These dates were derived from two facts.  Kuc's phone call with Wilson and Moore where Wilson described Kuc as his eyes and ears occurred on April 7, 2016.  And the final transaction where Kuc helped her niece purchase crack cocaine from Wilson occurred on October 4, 2017.

years' imprisonment,[7] the PSI reduced her guidelines range to 360 to 960 months. *See id.* § 5G1.2(b).

Kuc objected to the PSI's drug-quantity determination, saying "she should not be held accountable for the total amount of drugs manufactured and distributed by others." Doc. 509 at 42. For the court to hold Kuc responsible for the acts of others, it had to make individualized findings concerning the scope of criminal activity she agreed to jointly undertake with others. And, pointing to her trial testimony, Kuc argued that she had not jointly undertaken any criminal activity. And even if she agreed to jointly undertake criminal activity, Kuc urged, the PSI's drug-quantity determination was unsupported.

At the sentencing hearing, the district court addressed Kuc's objection. The court acknowledged that to hold Kuc responsible for a drug quantity that was based on jointly undertaken activity, it had to make an individualized finding concerning the scope of her jointly undertaken criminal activity and determine the "quantity of drugs reasonably foreseeable in connection with her level of participation." Doc. 660 at 22. Based on the evidence from trial, the district court found that Kuc had

---

[7] Because the jury determined that the conspiracy involved at least 28 grams of crack cocaine, 100 grams of heroin, and 40 grams of fentanyl, the statutory maximum for the conspiracy count was 40 years. *See* 21 U.S.C. § 841(b)(1)(B)(i), (iii), (vi) (statutory maximum of 40 years for an offense involving 28 grams or more of crack cocaine, 100 grams or more of heroin, or 40 grams or more of fentanyl). The statutory maximum for each distribution count was 20 years. *See id.* § 841(b)(1)(C).

agreed to undertake criminal activity with others and that the scope of the jointly undertaken criminal activity included the quantity of drugs the organization sold while she was participating in the criminal activity. To support its conclusion, the court pointed to evidence that Kuc had sold drugs and facilitated drug transactions, allowed Wilson and his brother to cook crack cocaine at her home, and acted as Wilson's eyes and ears in keeping him informed about what was happening at the Big House. The court acknowledged Kuc's trial testimony that she had not voluntarily participated in the organization. But the court found her testimony was not credible because it conflicted with other witnesses' testimony and the many recorded conversations that were entered into evidence.

The court found that the scope of the jointly undertaken criminal activity was the distribution of four cookies of crack cocaine (for a total of 32 grams) and 200 bags of heroin (for a total of 20 grams) each day. Because Kuc participated in the conspiracy for 545 days, the court determined that she was responsible for a total of 17.44 kilograms of heroin and 10.9 kilograms of heroin as well as 0.5 grams of fentanyl. The court found that it was "reasonably foreseeable" to Kuc that the jointly undertaken criminal activity included this quantity of drugs based on her "level of participation in this drug conspiracy." *Id.* at 25.

Using these drug quantities, the district court concluded that Kuc's total offense level was 40 and that with her criminal history category of V, her

11

guidelines range was 360 to 960 months' imprisonment.  The court sentenced Kuc to 360 months.  This is her appeal.

## II.    STANDARD OF REVIEW

We review for clear error a district court's determination of the drug quantity attributable to a defendant.  *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012).  For a finding to be clearly erroneous, we "must be left with a definite and firm conviction that a mistake has been committed."  *Id.* (internal quotation marks omitted).  When "a fact pattern gives rise to two reasonable and different constructions, the factfinder's choice between them cannot be clearly erroneous."  *Id.* (internal quotation marks omitted).

## III.    LEGAL ANALYSIS

Under the Sentencing Guidelines, to calculate Kuc's base offense level, the district court had to determine the quantity of drugs properly attributable to her.  U.S.S.G. § 2D1.1(a)(5); *see United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996).  A district court's findings of fact as to drug quantity "may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing."  *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989).  The government bears the burden of establishing the drug quantity by a

preponderance of the evidence.  *United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014).

Under the Guidelines, a defendant is held accountable for her relevant conduct.  *See* U.S.S.G. § 1B1.3.  In drug conspiracy cases, relevant conduct includes drug quantities with which the defendant "was directly involved" and also "all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity."  *Id.* § 1B1.3, cmt. n.3.; *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993).

To hold a defendant responsible for the conduct of others, the district court must make particularized findings about: (1) the scope of the criminal activity that the defendant agreed to jointly undertake, and then (2) whether the conduct of others was in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant.  U.S.S.G. § 1B1.3(a)(1)(B).; *see United States v. Hunter*, 323 F.3d 1314, 1319–20 (11th Cir. 2003).  In determining the scope of the criminal activity, the district court may consider any "explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."  U.S.S.G. § 1B1.3, cmt. n.3.  But a defendant's mere

awareness of a larger criminal undertaking is insufficient to show that she agreed to participate in the larger criminal undertaking. *See Hunter*, 323 F.3d at 1320–21.

When the quantity of drugs seized does not reflect the scale of the offense, the district court must approximate the quantity of drugs attributable to the defendant. *Almedina*, 686 F.3d at 1315–16; *see* U.S.S.G. § 2D1.1, cmt. n.5. A "court may rely on evidence demonstrating the average frequency and amount of the defendant's drug sales over a given period of time." *Almedin*a, 686 F.3d at 1316.

In this case, the district court found that the relevant conduct included not only the controlled substances that Kuc herself sold but also quantities of controlled substances that were sold by others in the conspiracy. On appeal, Kuc argues that the district court erred in making its drug-quantity finding because (1) it failed to make the required individualized determinations to hold her responsible for jointly undertaken criminal activity, and (2) the evidence does not support the district court's finding about the quantity of drugs that were part of any jointly undertaken criminal activity. We are not persuaded by either argument.[8]

---

[8] The government urges us to find that Kuc abandoned her challenge to the district court's drug-quantity determination because Kuc failed to develop adequately her argument in her appellate brief. But because Kuc's appellate brief "directly challenge[d]" the district court's drug-quantity determination, she satisfied the standard for invoking appellate review. *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018).

14

We begin with Kuc's argument that the district court erred by "fail[ing] to make individualized findings concerning [her] jointly undertaken criminal activity as required by USSG § 1B1.3(a)." Appellant's Br. at 19. The record directly refutes her contention that the district court failed to make individualized findings. The court found that the scope of the jointly undertaken criminal activity was the distribution of 32 grams of crack cocaine and 20 grams of heroin each day for a period of 545 days—the period of Kuc's involvement in conspiracy—for a total of 17.44 kilograms of heroin and 10.9 kilograms of heroin as well as 0.5 grams of fentanyl. And the court expressly found that based on Kuc's "level of participation in this drug conspiracy," this quantity of drugs was "reasonably foreseeable" to her. Doc. 660 at 25.

Kuc's other argument is that the record does not support the district court's finding about the scope of her jointly undertaken criminal activity. Her primary argument is that the district court clearly erred in holding her responsible for any quantity based on jointly undertaken criminal activity because she "had no joint criminal activity with the group other than buying its dope" and "never agreed to work with the others to sell dope." Appellant's Br. at 15, 17. She also argues, in the alternative, that even if there was some joint criminal activity, it was limited to allowing Wilson and his brother to cook crack cocaine cookies in her house.

15

The district court did not clearly err in finding that Kuc participated in a jointly undertaken criminal activity. After all, the district court pointed to evidence at trial showing that Kuc sold drugs and facilitated drug transactions for Wilson, allowed Wilson to cook crack cocaine in her home, and served as Wilson's eyes and ears by watching the Big House for him.

Kuc argues that the district court instead should have concluded that she never participated in jointly undertaken criminal activity based on her own testimony that she participated in no such activity, did not sell drugs, and was coerced into allowing Wilson and his brother to cook crack cocaine in her home. Certainly, Kuc offered this testimony at trial. But the government offered evidence at trial that contradicted her version of events. At sentencing, the district court expressly found that Kuc's testimony was not credible, which it was entitled to do. *See Wilson*, 884 F.2d at 1356 (recognizing that a district court may make a factual finding at sentencing based on evidence at trial).

Kuc's alternative argument is that even if there was evidence that she jointly undertook some criminal activity, her participation was limited to allowing Wilson and others to cook crack cocaine in her house. And based on this limited jointly undertaken activity, she says, the district court should have held her responsible for

no more than 5.82 kilograms of crack cocaine.[9]  But the district court did not clearly err in finding that the scope of Kuc's jointly undertaken criminal activity extended beyond Wilson's cooking crack cocaine in her home.  There was testimony that Kuc regularly sold drugs out of her home.  And when Wilson went out of town, he left her to sell $9,000 worth of heroin for him.  In addition, Kuc's recorded statements suggest that the jointly undertaken criminal activity included her selling significant quantities of drugs.  When Wilson failed to come through with the eight-ball of heroin that Kuc had arranged for her niece to purchase, Kuc ranted, "[I] don't get up and move around for fucking two bags, three bags, 45 fucking dollars.  I don't even get out of my bed.  I could have stayed in my bed and made more than that."  Doc. 423-17 at 2.  This statement supports an inference that Kuc was regularly selling large quantities of drugs supplied by Wilson.  Given all this evidence, we cannot say that the district court clearly erred in finding that the scope of Kuc's jointly undertaken criminal activity extended beyond allowing Wilson to cook crack cocaine in her home.

But even assuming, for the sake of argument, that Kuc is correct that the district court should have held her responsible for no more than 5.82 kilograms of crack cocaine, any error was harmless.  Using this drug quantity, Kuc's base

---

[9] This number is based on an estimate that Wilson and his brother cooked 32 grams of crack cocaine at Kuc's house every third day for a 545-day period.

17

offense level would have been 34. *See* U.S.S.G. § 2D1.1(c)(3) (assigning base offense level of 34 to an offense involving "at least 2.8 KG but less than 8.4 KG of Cocaine Base"). And with enhancements for Kuc's maintenance of a premises for the purpose of manufacturing and distributing controlled substances and obstructing justice, her total offense level would have been 38. Given Kuc's criminal history category of V, her guidelines range would have been 360 months' to life imprisonment. *See* U.S.S.G. ch. 5, pt. A (Sentencing Table). Because the statutory maximum in this case was 80 years, her guidelines range would have been 360 to 960 months. As a result, even if the district court had limited the drug quantity to 5.82 kilograms of crack cocaine, Kuc's guidelines range would have remained the same, making harmless any error the district court made using a drug quantity greater than 5.82 kilograms of crack cocaine. *See United States v. Alicea*, 875 F.3d 606, 609 (11th Cir. 2017) (recognizing that error was harmless when defendant's guidelines range "would remain the same" without the error); *United States v. Mathis*, 767 F.3d 1264, 1284 (11th Cir. 2014) (concluding that any error in application of enhancement that increased the defendant's total offense level was harmless when the defendant's "guidelines range was the same with or without the enhancement"), *abrogated on other grounds by Lockhart v. United States*, 136 S. Ct. 958, 961 (2016).

## IV.    CONCLUSION

For the above reasons, we affirm Kuc's sentence.

**AFFIRMED.**